GEORGE BRUCE *v.* JOHN J. V. WESTERVELT, Sheriff of the City and County of New York. (*a*)

Where the sheriff sells the property of joint debtors, at once, under numerous executions, the title of a *bona fide* purchaser at the sale will not be invalidated by the fact that some of the executions were issued upon judgments entered on the confession, without action, of one partner against both. It is sufficient to confer title, that a part of the executions were founded upon judgments in actions wherein process was duly served.

An owner who has let personal property for a certain term, cannot, while the term is yet unexpired, maintain an action in the nature of replevin against a third person for a wrongful taking.

Where a part of property, sold under execution, consisted of stereotype plates, which, although accessible, were not, in accordance with the directory provisions of the statute, in actual view at the time of the sale; it was *held*, that, although a sheriff cannot sell by sample, yet that, for the purpose of furnishing *criteria* whether the sale was so conducted as to bring the best price, it was competent to show, that the plates would suffer injury by handling—that impressions therefrom were displayed—and that such was the usual mode of disposing, at trade sales, of articles of the kind.

Upon a sheriff's sale, under execution, of articles constituting the establishment of a publishing house, certain stereotype plates, being part of the property sold, were in a vault connected with the building, but apart from the rooms wherein the sale took place. *Held*, that the sale would have been void if the vault was locked, or the plates were in such condition that they could not be reached and examined by the persons in attendance; but that the sale was valid if, at the time thereof, an opportunity was given to the purchasers to go and examine the plates, although the same were not immediately in view.

In an action to test the validity of a sheriff's sale under execution, evidence of a negotiation and agreement during the progress of the sale, between certain execution creditors in attendance, whereby it was arranged that a party, in view of specified considerations, was to bid in the property, with the alleged object of preventing a sacrifice, is admissible as part of the *res gestæ*, and is proper to repel any presumption of fraud.

Where, at an execution sale, different articles were disposed of in one lot, with the debtor's assent and at the request of judgment creditors and others interested, who were present; it was *held*—there being no proof of bad faith—that evidence of the mere intention of persons attending the sale to purchase, in case the property had been sold in separate parcels, was incompetent.

(*a*) Affirmed in the Court of Appeals.

In an action of replevin, to obtain property purchased at an execution sale, how far the questions, whether there was an intent to defraud creditors—whether the property was within view of those attending the sale—whether it was offered in such lots and parcels as were calculated to induce the highest prices—and whether the plaintiff has in any manner parted with his present interest in the property in such wise as to bar his prosecution of the suit, are questions of fact for the jury? *Quere.*

In submitting to a jury a question of fact, a judge may add the expression of his own opinion, in relation thereto, upon the testimony; and such an exercise of his discretion forms no ground for exception.

THIS was an action of replevin, brought against the sheriff of the county of New York, for a printing press, valued at $1,000.

The plaintiff claimed the property, as purchaser at a sale under five executions against the original owners, Piercy & Reed. This sale took place in October, 1846, and was conducted by the defendant's predecessor in office. In January, 1847, under another execution *against the same debtors*, the defendant levied upon and resold the press in question, on the ground that the former sale was void.

The main issue in the case was, therefore, upon the question of the validity of the first, or October sale, the circumstances whereof were substantially as follows:

The debtors were the proprietors of an extensive printing and publishing house. Catalogues having been circulated among the trade, and a large attendance secured, their partnership effects, consisting of presses, types, printing materials, stereotype plates, books, desks, and other articles, were put up for sale at auction. The articles were distributed through the third, fourth and fifth stories of the building. They were divided and classed in lots, and the first ninety-nine were sold separately, at what was deemed by the creditors present a sacrifice. Apprehensions were expressed that the proceeds of the sale would be insufficient to satisfy the executions. At the instance of creditors, the sale was suspended for half an hour, and negotiations ensued, which resulted as follows: Two of the execution creditors purchased, for $1,000, a judgment held by a third, amounting to about $4,500. The

plaintiff, who was a creditor, but whose claim was not in judgment, then agreed to bid, for the balance of the property remaining unsold, a sum sufficient to pay the $1,000, and seventy-five cents on the dollar of the four remaining executions, together with the expenses of the sale, or to make up that sum in case the articles remaining unsold were bid in by him for a less amount.

At the request of the creditors and upon the debtors' assent, the sheriff put up the balance, forty-five lots, which included the press in controversy, in one mass. The bidding was spirited, and ended in the plaintiff becoming the purchaser for the sum of $1,500. The matter was afterwards adjusted between the plaintiff and the other parties to the above negotiation, and the gross amount paid by the former, including the $1,500 last mentioned, was $4,525. The plaintiff took from the sheriff a bill of sale, enumerating the articles. The bill was receipted, the sum named therein being $1,500.

The evidence relating to the agreement made during the interval at the sale, and also respecting the subsequent adjustment, was admitted under exceptions, as was also the statement of a witness that it was not supposed that the last forty-five lots could realize more than $4,500, and that, therefore, no provision for that event was made in the agreement with the plaintiff. These objections are referred to in the first point made by the defendant's counsel.

Among the articles last sold were the stereotype plates of five publications. At the time of the sale, a part of these plates were in a vault connected with the building, and not in the actual view of the persons in attendance.

The court, on reviewing the verdict given on a former trial, having distinctly held that the sale was void if the vault was locked, or if the plates were not in a condition to be reached and examined, the plaintiff endeavored to prove that the vault was open and the plates accessible.

The evidence on this point was as follows:

The deputy sheriff, who had the immediate direction of the

sale, testified, " I saw some stereotype plates in the office of Piercy & Reed, but I never went into the vault, or knew where it was, or saw any property there; I never directed any body's attention, at the time of the auction sale, to any property there; I did not know there was any property there. " Ten minutes time was given to examine the goods, and they were called off by items, from a printed catalogue; and then they were sold. " The sale was commenced in the third, continued in the fourth, and completed in the fifth stories. " Books printed from the plates were in the office on the third floor."

The attorney and counsel of one of the creditors, who was present at the sale, stated, " My recollection is, that an announcement was made at the sale that there were stereotype plates in the vault, and that they could be examined; I saw books in the office."

A witness said, " I should think time enough was not allowed, after the announcement that the sale would be in a lump, and before the property was bid off, to enable any one to go to the vault," nor " to examine the goods. " I was present during the whole sale, and I saw no stereotype plates, nor books from stereotype plates shown. " There appeared some few stereotype plates on a shelf in the office."

. Another witness, one of the execution creditors, testified, " The stereotype plates were in the vault. " No person went there to see them, that I knew of."

The auctioneer was called and said, " I do not recollect the vault; I might have announced that the stereotype plates were in the vault; I do not recollect ever seeing them.

. " I think there was no announcement made by me that stereotype plates in the catalogue, and included in the lump sale to the plaintiff, were in the vault. " I do not recollect that there were any plates there. " I saw no stereotype plates at the sale."

Another person in attendance testified as follows: " I went there to examine the property before the sale; I had an opportunity of examining the plates; I saw some plates in the

office; I heard some persons, attending the sale, talk about the plates in the vault; I never was in the vault."

Piercy, one of the debtors, who was present, said, " Most of the stereotype plates sold at the sale and included in the lump sale, were in the vault at the time. " They were worth about $400. " The stereotype plates which were in the office did not belong to Piercy & Reed. " The vault in which these plates were contained was very far down, and ran through, under ground, almost to the middle of the street, and was difficult of access; the entrance to the vault was from the counter cellar; I am not sure the entrance was from the counter cellar; I think I was mistaken as to entrance to vault being from counter cellar; it was from the basement of the building; it was immediately under the street walk."

Reed was also sworn as follows : " I was in the fifth story most of the time during the sale; the stereotype plates mentioned in the catalogue were four sets in the vault of the house under the sidewalk, and one set in the counting room, third story ; the plates had never been taken out; I was in the upper part of the building ; I was not in the vault; I cannot say whether the vault was open or not, nor whether any one went into it; the sheriff nor any one else had not seen the plates, to my knowledge. " Their value, I suppose, was about three hundred dollars. " The persons attending the sale were not in that part of the building, to my knowledge."

Finally, the following was elicited from an employee in the press room of Piercy & Reed : " I was at the establishment part of the time of the sale in October, 1846. " A laborer was employed to bring the stereotype plates from the vault to the office on the third floor. " I think previous to the day of sale—not particularly on the day of sale—the plates were brought up in the office. " I know pretty much all the stereotype plates in the concern, and the greater part were up stairs. " I cannot say they all were. " I think the vault was not kept locked, and that it had not been locked for some time before the sale. " I think the door had been

broken some time before the sale. "There were plates brought out of the vault to the office previous to the day of sale. "I think the greater part of the plates were up on the day of sale. "I cannot say they all were. "I think the vault was open on the day of sale."

"It is about five years since this sale, and my memory is not perfect about the incidents, although I recollect perfectly the sale; Reed & Piercy were sending me out from time to time, and when I came back the sale was concluded. "I cannot swear that the laborer employed was in the vault the day of sale, or that any of the plates were taken out *that day;* I don't recollect going down to the vault on day of sale."

Evidence was given that plates of the kind would suffer injury by handling; that impressions therefrom were displayed; and that such was the usual mode of disposing, at trade sales, of articles of the kind. Exceptions were also noted to this testimony.

On the above proofs the question whether the plates were within reach or were so situated as to afford an opportunity to see and examine them, was submitted to the jury.

Two witnesses, produced for the defence, were questioned with the avowed purpose of showing that they were present at the sale and intended, in case the articles were sold separately, to purchase some of those which comprised the lot last disposed of, at higher average prices than were in effect realized in the sale to the plaintiff. This evidence was objected to and the objection sustained.

Three of the five judgments, whereon the executions were founded, were entered—as appeared from the records in evidence—upon the confessions of one partner against both, without the service of process. The defendant offered parol testimony to the same effect, which was excluded. It was not alleged that the manner in which the judgment originated was known to the plaintiff.

After the sale, in October, 1846, the press in question was not actually delivered to the plaintiff, but remained in the

same building till again levied upon by the defendant, in January, 1847, under another execution against Piercy & Reed. It was objected, that there had been no actual change of possession. On this point, the plaintiff's evidence was, that in November, 1846, he hired the building from the owner, and paid rent from the first day of that month, although a written lease was not executed till December 18, 1846. Previously to November, the premises were occupied by Piercy & Reed. On the sixth of December, Reed and one Cunningham, who had formed a partnership together, went into possession of the building, with the plaintiff's consent, under no definite agreement, but with the understanding, that rent should be paid, and some distinct contract be entered into when the terms could be fixed and assented to. The testimony, in respect to this arrangement, was inconsistent and uncertain. The defendant contended that it established such a hiring to Reed & Cunningham of the building and its contents, anterior to the levy in January, as to divest the plaintiff of an actionable interest at the time of such levy.

In September, 1847, a written lease by the plaintiff to R. & C., *ante-dated* November 1st, 1846, was executed, whereby the building and appurtenances, including printing presses, &c., were let to them. The defendant claimed that this lease related back to 1846, and that the plaintiff had not, therefore, in January, 1847, such property in the press in controversy as to enable him to maintain replevin. A schedule was annexed to the lease, enumerating a list of articles, but the press in question was not mentioned.

On the first trial of the cause, the plaintiff recovered a verdict, which was set aside at a general term, ULSHOEFFER, then the first judge of the court, delivering the opinion. The second trial resulted in a nonsuit, which was also set aside at a subsequent general term, when WOODRUFF, J., delivered a dissenting opinion. The case was tried a third time, before INGRAHAM, FIRST J., and the plaintiff had a verdict for damages, $210, the value of the property being assessed at $600. A

motion for a new trial was denied at special term, and the defendant brought this appeal.

The questions raised were founded upon exceptions to the rulings of the court in the admission and exclusion of testimony, the denial of a motion for a nonsuit, and matters contained and withheld in the charge.

The defendant requested the court to direct the jury as follows:

1st. That if the sale was not in such parcels as was calculated to bring the highest price, the plaintiff acquired no right to the property in question, under the sale, as against the creditors, under whose execution the property in question in this suit was taken.

2d. That a sale of articles not present in connection with other articles present, is irregular and void, as against creditors.

3d. That if the jury believe, under the testimony, that the property in question at the time of the levy by the sheriff was in the possession of Cunningham & Reed, under a letting to hire by the plaintiff, for a term then unexpired, the defendant is entitled to a verdict.

4th. That the subsequent possession of the property by Reed, after the alleged sale to the plaintiff, is *presumptive* evidence of fraud, and is *conclusive* evidence of fraud, unless the plaintiff has shown affirmatively that the sale and purchase were made in good faith, and without intent to defraud creditors.

5th. That in judgment of law under the evidence, the sale of the articles in question was void.

6. That in judgment of law under the evidence, the plaintiff stood in the light of a purchaser under his own executions, and is not entitled to the benefits of a *bona fide* purchaser.

The following are extracts from the charge:

"If the October sale was valid, the defendant is a trespasser for proceeding and selling the press under the later execution in January, and is liable in this action. "If, how-

ever, the first sale was void, any other judgment creditor had a right to cause the property to be levied upon and sold, as if the first sale had not taken place.

" There is a question as to the right of the plaintiff to maintain the suit at all. " The defendant claims that the evidence shows the right of possession to have been in Reed & Cunningham, under a definite letting from the plaintiff for a term which had not expired at the time of the levy. " This is a matter of great doubt in my mind, as the lease was not executed until after the sale of this press under the later execution. * * " It is a question of fact for you to decide ; * and as you determine, you must find for the plaintiff or the defendant.

" The main question, however, is under the sale in October, 1846, itself. " This was made under various executions. Harries, another judgment creditor, whose execution was also in the sheriff's hands at the time, was not present. * * " Now, there are two objections made to this sale in mass : *First*, that the property was put up in too large a lot ; and *Second*, that it was not in view of the purchasers at the sale. [The court here stated the language of the statute.] " The first objection involves the conduct of the officer. " He is vested with great discretion. " In the case of parties interfering to produce such a sale, I should be inclined to say to you, that such as the one described would not do ; but where there is no combination or interference with the sheriff in the discharge of his duty, it would be a dangerous thing to say that a sale was void, because the lots were too large or too small. " It would, however, not do for a sheriff to put up a whole stock of goods, or a drove of horses, at one time. " Discretion should be used by a sheriff in reference to the size of lots to be sold by him. " Here the creditors of Piercy & Reed and Bruce agreed, and the sheriff says, if any one had objected, he would not have sold in one lot— an inference that he thought this mode improper. " Piercy says that he was not consulted, and the fact that Bruce was a party to this arrangement, relative to the sale, places

him in a different position from what he would have occupied had he been a purchaser merely, without being a party to the arrangement.

" There has been proof here, on both sides, as to the value of this property and the amount Bruce was to pay ; but the amount he bid for the property—one thousand five hundred dollars—is all he can be considered as having paid, so far as creditors are concerned. " The evidence of the additional sum over this bid of one thousand five hundred dollars, I admitted only as ground of showing the good faith of the plaintiff. " The statute required that the sale should be in lots calculated to bring the best prices ; and it is for you to say whether it was complied with.

" I am not prepared to say that property must always be displayed fully, as sugar in barrels, salt in sacks, &c. " The property must, however, be in view of purchasers, so as to enable them to examine it, to prevent a fraud on debtor or creditor. " The sellers must be enabled to get the best price they can. " The main objection to this sale on this point is, that certain stereotype plates, valued at different prices, were not in the presence or view of the purchasers at the time of this sale to Bruce, for one thousand five hundred dollars, of articles in which they were included, but that they were at the time in a vault under the street, and some distance from the place of selling. " All the judges of this court have agreed in opinion, that if the vault in which these plates were contained was, at the time of sale, locked, or the plates were in such a condition that they could not be reached and examined by the persons attending the sale, then the sale was void, and accordingly the defendant here would be entitled to a verdict. " The sheriff says he never saw them. " Piercy says they were in the vault at the time of sale. " You must look into the testimony and see as to this point; you must judge from the testimony whether, at the time of sale, there was an opportunity given for the purchasers to go and examine the property not immediately in view ; and, as you determine this, you will find for the plaintiff or defendant on this point.

"It is said that stereotype plates are usually sold by sample, viz., by exhibiting a book printed from the plates; but the sheriff cannot sell by sample; he must have the property within his view and reach.

"In connection with this branch of the case, there is another matter for your consideration, whether or not, by this agreement between the creditors at the sale and the plaintiff, the property brought so low a price that it was intended to defraud other creditors, or rather, I should say, whether, in its result, it was not calculated to defraud other creditors. "Was it a fraud on creditors? "Sustain the sale or not, as you find.

"The remaining question is that in relation to the change of possession. "The law requires, after property is sold, it must not go into the possession of the debtor; and if it does, creditors may call upon the purchaser and require him to show that he is an honest purchaser; that the sale was made in good faith, and without any intent to defraud creditors. "In this case the plaintiff alleges there is a consideration proved, and the plaintiff says it was left for a good motive. "If you find that after the sale the judgment debtors, or either of them, remained in the possession and use of the property, you must be satisfied that the sale was made in good faith, and without any intent to defraud creditors, or you will find a verdict for the defendant. "The subsequent possession of the property by Reed, after the alleged sale to the plaintiff, is presumptive evidence of fraud, and is conclusive evidence of fraud, unless the plaintiff has shown affirmatively that the sale and purchase was made in good faith and without intent to defraud creditors.

"The questions, therefore, for your determination, are, *First*, whether, at the time this suit was commenced, the plaintiff or Reed & Cunningham were entitled to the possession of this press. "If you find the plaintiff was, then your verdict should be for the plaintiff; otherwise, for the defendant. "*Second*, If you find the possession in the plaintiff, then was the property sold in too large a lot, so as not cal-

culated to bring the best price; and was it in view or in such a position that purchasers could examine it if they wished? " *Third*, Did Bruce, the plaintiff, pay a consideration, and was he a *bona fide* purchaser, and without any intent to defraud creditors; and has he given you a sufficient excuse for leaving it in the possession of Piercy & Reed, or either of them?

"In either event, you are to find the value of the property at the time of the taking, and if you find for the plaintiff, you are to give him such damages for the detention, as, under the circumstances, you think he is entitled to."

The court refused to charge, that in judgment of law, under the evidence, the sale of the press in question was void, or that, as matter of law, the defendant was entitled to a verdict.

*N. Bowditch Blunt* and *David Dudley Field*, for the defendant, argued the following points:

I. The evidence embraced within some of the exceptions related to a private agreement among third parties, with which the sheriff and other creditors had nothing to do, and which, certainly, was inadmissible to affect the rights of creditors. The effect of this evidence was to induce the jury to overlook or to compromise the question as to whether the property had been sold in the manner required by statute.

II. The custom at trade sales could not be used to affect or alter the law relating to and regulating sheriff sales. The statute is imperative upon the mode in which the sale shall be made. (2 Revised Statutes, 367, § 23, p. 616, § 32 of 4th ed.) The effect of the admission of this evidence was to nullify the statute. No custom in the sale of any particular description of goods can be admitted to control the general rules of law. (*Thompson* v. *Ashton*, 14 Johns. R. 316; *Hinton* v. *Locke*, 5 Hill, 437.) With much less propriety can it be admitted to control a special statute.

III. The court erred in rejecting the testimony offered as

to the confessions of judgment.   1. The plaintiff rested his title to the property in question upon an alleged purchase at sheriff's sale, under the executions.   We insist that a purchaser at sheriff's sale stands in no better position than the sheriff himself, so far, at all events, as title is concerned. Here Bruce was a party to the illegal act, in intent as well as in deed.   (*Van Antwerp* v. *Newman*, 2 Cowen, 543; *Hull* v. *Carnley*, 1 Kernan, 501; *Carter* v. *Simpson*, 7 Johns. R. 535; *Mowrey* v. *Walsh*, 8 Cowen, 238; *Van Cleef* v. *Fleet*, 15 Johns. R. 147.)   2. The rule of *caveat emptor* applies to sales by sheriffs and trustees of all kinds.   (*Danley* v. *Rector*, 5 Eng. R. 211; *Wood* v. *Lewis*, 14 Penn. State R. 9.) The sheriff, in making the sale, is but the instrument of the law; the creditor who has the property sold a second time has a right to show, if he can, that the first sale was collusive, and therefore void.   (*McMichael* v. *McDermott*, 17 Penn. State R. 353.)   3. If the judgments against Piercy and Reed were judgments by confession of one partner, without the privity, knowledge or assent of the other, and without the previous issuing of process, the partnership debt was converted into the individual debt of the copartner confessing the judgment, and the sales under the executions issued on those judgments would not withdraw the goods from the execution of the creditors of the former.   Nothing would pass at the sale under the executions, except the right of Reed, after the partnership debts were all paid; yet, by the agreement with Bruce, which the plaintiff was allowed to prove, the proceeds of the property were to be withdrawn from the partnership creditors, and applied to the individual debts of Reed.   (*Crane* v. *French*, 1 Wend. 311; *Stoutenburgh* v. *Vandenburgh et al.*, 7 Howard, 229.)   4. The defendant had a right, therefore, to give in evidence the circumstances under which those judgments were obtained.   5. The evidence was admissible, at all events, as bearing upon the good faith of the parties to the sale and purchase.

IV. The court erred in rejecting the proffered testimony, in respect to the intention of persons to purchase if the arti-

cles had been sold separately. 1. This testimony was certainly admissible, as tending to show that the value of the property was deteriorated at the lump sale, and the want, in consequence thereof, of fair competition. 2. Besides, it was proper to rebut the supposition, which one of the creditors testified was entertained by him and others, that the property could not realize more than the plaintiff would be compelled to pay for it under the arrangement made with him at the sale.

V. The court erred in refusing to nonsuit. 1. There was no contradictory evidence as to the character and mode of sale, and the question was one of law for the court, and not of fact for the jury. 2. No title to the press passed, the sale not having been conducted in conformity with the positive requirements of the statute. (*a.*) The sale of the articles in mass (including the press in question) was in violation of the statute. (*b.*) The property was not present and within the view of those attending the sale. (*c.*) The sale of the articles not present, in connection with other articles present, rendered the sale irregular and void as against creditors. (2 R. S. p. 616, § 32, 4th ed.; Id. p. 291, § 23, 1st ed.; *Stief* v. *Hart*, 1 Comst. 20; *Bakewell* v. *Ellsworth*, 6 Hill, 484; *Waring* v. *Loomis*, 4 Barb. 484; *Sheldon* v. *Soper*, 14 Johns. R. 352; *Cresson* v. *Stout*, 17 Ib. 116; *Haggerty* v. *Webber*, 16 Ib. 287; *Stevens* v. *Baird*, 9 Cowen, 274; *Blanton* v. *Morrow*, 7 Ired. Eq. R. 47; *Ainsworth* v. *Greenlee*, 3 Murphy, 470; *Gibbs* v. *Needy*, 7 Watts, 305; *Boodie* v. *Segraves*, 1 Taylor, 144.) (*d.*) Extrinsic evidence cannot be resorted to to show what was intended to be sold. (*Mason* v. *White*, 11 Barb. 173.) 3. The lease of the property, although executed on the 3d September, 1847, related back, by operation of law, to the 1st of November, 1846, and at that time the property in question was on the premises, and embraced in the parol agreement, which subsequently matured into the written lease. Bruce could not sue pending the lease. (*Van Antwerp* v. *Newman*, 2 Cowen, 543; *Pain* v. *Whittaker*, R. & M. 99; *Bradley* v. *Copley*, 1 C. B. R. 685; *Ward* v. *McAuley*, 4

T. R. 489; *Gordon* v. *Harper*, 7 Johns. R. 9; *Hull* v. *Carnley*, 1 Kernan, 501.) 4. The sale under which the plaintiff claimed title was unaccompanied by delivery, and there being no actual and continued change of possession, it was therefore fraudulent and void as against creditors. 5. The sale of the *entirety* under executions against one partner, passed no valid title to the purchaser; *a fortiori*, to Bruce, who cannot claim that he was a purchaser without notice.

VI. The agreement under which Bruce purchased established that the sale was fraudulent and collusive. The statute relative to sales by sheriffs under execution, and also the statute relative to sales by auctioneers, (1 R. S. 1,067, 4th ed.,) require that they should be so conducted as to ensure fair and honorable competition—fraudulent practices are declared to be misdemeanors. (Chap. 52, § 3, Laws 1838.) The effect of the agreement was: 1. To prevent the officer from exercising that discretion which the statute confers upon him, as the instrument of the law in making the sale. 2. To destroy fair and honorable competition—preventing the persons from bidding who, before the arrangement was made, were interested in causing each article sold to bring the highest price. 3. To prevent others from bidding who only wanted certain portions of the property. 4. Creditors who were not party to the arrangement or were not represented at the sale, had a right to expect that the sale would be conducted in the ordinary way, untrammeled by any contrivances or schemes. 5. Public policy requires that a sale so conducted should not be sustained in favor of a purchaser who had notice of all the facts, and must be presumed to have known the law.

VII. The court erred in refusing to charge as requested.

VIII. The court erred in the charge in the points excepted to.

*C. J.* and *E. De Witt* and *James W. Gerard*, for the plaintiff, made and argued the following points:

I. Upon a charge submitting all the questions raised by the defendant, the jury found : 1. That at the time this suit was commenced, plaintiff was entitled to the possession of the press in question. 2. That the property was sold in such manner as was calculated to bring the best price. 3. That it was in such a position as to be in the view of purchasers, or within their power to examine. 4. That the plaintiff was a *bona fide* purchaser, and that the sale was made in good faith, and without any intent to defraud creditors. The exception to the charge was to the judge's refusal to hold, that as matter of law, the defendant was entitled to a verdict, and to the expression of an opinion on a fact, fully submitted to the jury. This latter is not matter of exception. These four points were for the jury to pass upon, and this court will not, on appeal on the law, disturb their finding, the judge having, on the trial, given the defendant the full benefit of his defence, in the four different aspects in which it is above presented, and allowed him the greatest scope to contest the validity and regularity of the sales. The course of the trial and the charge of the court threw upon the plaintiff the burden of proving each of the propositions above referred to. The verdict shows that he succeeded in establishing them, and the character of the evidence removes all doubt as to the propriety of the submission of the case to the jury.

II. As to the refusal to nonsuit. The question of fraud, arising from want of change of possession, is one of fact and not of law ; there is no such thing as fraud in law. If no possession was ever taken, yet, if from the consideration paid or other facts proved, the presumption of fraud is repelled, it is no matter whether possession was taken by the purchaser or not. (4 Denio, 174.) But there was evidence of the fullest possession of the entire property purchased, including the press in question, in the plaintiff. The sale under Ketchum, Rogers & Bement's judgment was in January, 1847. In November previous, Mr. Bruce hired the building from Mr. Marshall, and paid him rent from the 1st of November ; the written evidence of the lease was executed 18th

December, the agreement existing verbally before. In November, Mr. Bruce agreed with Cunningham for the possession and hiring of the property, and actually went into possession on the 7th December, long before the levy made. Cunningham then was in possession under Bruce, and Cunningham's possession was Bruce's possession. These matters were for the jury, and the payment of the consideration money, and the circumstances under which Mr. Bruce was induced by the creditors to buy, repel any idea of fraud to injure creditors, and so have the jury found.

III. The second and third grounds for a nonsuit are equally untenable: the statute is directory merely, and as the law does not designate the size of a lot, that, therefore, must always be determined by the jury. No judge can judicially know how small or how large a lot must be. It depends upon the articles to be sold, upon the company present, and whether certain articles will sell better together or alone—in a word, the question depends upon numerous contingencies. So, also, the point whether the articles were sufficiently in view when sold was for the jury to pass upon. The object as well as the language of the statute is, that the sale should be in lots calculated to bring the best prices, and the judge submitted that to the jury. (2 R. S. 4th ed. p. 616, § 32; *Tifft* v. *Barton*, 4 Denio, 171.) As to some of the articles not being in view, the answer is, the press was in the building and susceptible of examination; the blocks from the plates were visible and some of the plates. Time was given for examination, and from the evidence there can be no doubt there was an opportunity for inspection, and that the purchasers saw the articles. Again, the sale was not objected to, but acquiesced in by both judgment creditors and debtors. (9 Cowen, 274; 7 Wend. 83.)

IV. As to the fourth ground for nonsuit. The rights of the parties must be settled by the facts as they existed at the time of the levy, and then there was no agreement which could deprive the plaintiff of his right of possession. The possession Cunningham had was merely as bailee for Bruce.

Cunningham shows, that when the press was levied on and sold, there was no definite agreement, and in the subsequent written agreement the press was not included, for the reason that it had been previously levied on and sold. The doctrine of relation applies only to parties to agreements.

V. To the last ground for nonsuit, the answers are :

1st. We did not require the aid of the judgments to go to the jury. The plaintiff had given evidence of three sources of title, without the judgments. A. He had given in evidence the executions, the sale of the property to him, the bill of sale receipted, and the consideration paid by him to the execution creditors. (Sewall's Sheriff, p. 260.) B. He proved, besides, that Cunningham was in possession for him, under no definite agreement as to time, and his possession of personal property is evidence of this title. (Cowen and Hill's Notes to Phil. on Ev. vol. 1, 295–353.) C. He had also proved a sale made to him voluntarily by the consent of the defendants in the execution, and of all the execution creditors who had any interest in the goods, and no person ever applying to set the sale aside, but allowing Mr. Bruce to pay for the goods and have possession of them. (*Orser* v. *Storms*, 9 Cowen, 274 ; *Jackson* v. *Roberts*, 7 Wend. 83.) On a sheriff's sale, a purchaser, as against another creditor whose execution is subsequent to the one under which he bought, need only prove the execution and the sale ; *he is not bound to prove the judgment.* It will be remembered that this is not against land, nor is it an action by a purchaser at sheriff's sale to get from the *defendant* in the execution possession of the property, which the purchaser *claims to have bought.* (12 Wend. 96.)

2d. But if the purchaser, to establish trespass against a taker from his possession, is bound to show a title from the judgment; in this case such title was clearly shown. All five of the judgments are produced, on which the five executions were in the sheriff's hands at the time of the sale, and under which he sold to Mr. Bruce.

3d. If either of the five judgments was good, the sale was

valid, and a sufficient title would have passed to the purchaser. The two judgments of Brandreth and Harris were upon the confession of both defendants. *Non constat,* that in a judgment confessed by Reed alone, the declaration was not served upon him before the confession was given; and no testimony was given to show the contrary. By the act of 1833, (Laws of 1833, p. 395, § 3,) a declaration may be served on one defendant, and he may confess a judgment, under which the sheriff may levy and sell the joint property. (10 Wend. 631.)

4th. All those three judgments are regular on their face, according to the statutes then existing, and the executions were issued against the joint property of both defendants, according to the statutes then existing. (2 R. S. 2d ed. p. 137, §§ 15, 16; Ib. p. 299; Ib. p. 343; §§ 1 to 7, errors, if any, amendable.) The purchasers, however, cannot be affected by any irregularities in the judgments, nor can their title be impeached by a collateral inquiry into such irregularities. (See *Jackson* v. *Roosevelt,* 13 Johns. R. 97; *Jackson* v. *Cadwell,* 4 Cowen, 622; 1 Cowen, 611, 2d vol. of Cowen and Hill's notes to Phil. on Ev. 853, 855, 978; 4 Wend. 584; 7 Wend. 83; *Allen* v. *Portland Stage Co.,* 8 Greenleaf's R. 210; 2 Bibb's Rep. 202.)

VI. The testimony of the witnesses, Benedict and Adee, was properly excluded; it was too vague and uncertain to be received as evidence. A mere uncommunicated intention presented an intangible and hypothetical inquiry irrelevant to the issue. The offer is best answered in its own words. It was an offer to show probabilities, not facts.

VII. As to the exceptions of admissibility of testimony. The testimony of Burnap (as to the negotiation and agreement at the time of the sale, and the subsequent adjustment with the plaintiff in pursuance thereof) was admissible as part of the *res gestæ,* and was proper to repel any presumption of fraud, and to show that the sale was conducted in good faith. The question of the agreement was gone into without objection in the examination of a previous witness. The testimony

as to the mode of selling stereotype plates at trade sales, and the injury which they would sustain by handling, was properly admitted as furnishing *criteria* whether the sale was so conducted as to bring the best price; and to this limit the judge confined the testimony in his instructions to the jury.

By THE COURT. DALY, J.—The portion of Burnap's testimony, to which the defendant excepted, was admissible. It was a part of the *res gestæ*. It was proper to repel any presumption of fraud, and show that the agreement or understanding in respect to the manner of the sale was entered into in good faith.

The testimony received for the purpose of showing the mode of selling stereotype plates at the trade sale was unobjectionable. The impression taken from the plates, might be more satisfactory in guiding the judgment of buyers, than the inspection of the plates themselves. And the usual and customary mode of disposing of a peculiar article of this description, among the trade, might serve to explain why no inspection of the plates took place among the persons present. It appeared, moreover, from other testimony in the case, that the value of stereotype plates depends upon the saleable character of the books printed from them; that the books, in this instance, were well known; and that the plates were only valuable as type metal. All these circumstances would go to show that an inspection of the plates was not essential to aid the buyers; and that though an opportunity was afforded them to inspect them, they did not think it necessary to do so. There was more evidence upon this than upon either of the former trials, to show that the plates could have been seen by those attending the sale. A witness said, that according to his recollection, an announcement was made at the sale, that there were stereotype plates in the vault, and that they could be examined. There was proof that the vault was open, and that the greater part of the plates were up on the day of sale. The mode of selling such plates at the trade sale might, therefore, serve to explain why the

plates were not examined; and in that view the testimony, I think, was admissible.

The testimony offered respecting the judgments was inadmissible. Even if the judgments of Burnap & Babcock and Ballou were entered up without process being served upon either defendant, and were thus, according to the ruling in *Stoutenburgh* v. *Vandenburgh*, (7 How. P. R. 230,) judgments only as against Reed, who confessed them, nevertheless the sheriff had authority to sell under the other judgments, in which suits were commenced and process served; and that was sufficient to pass a title to the plaintiff.

The intention of the witnesses, Benedict and Adee, was, as testimony, altogether too vague and uncertain to be received in evidence. What was called the lump lot was sold in that way, after the sheriff had allowed the parties interested half an hour to confer together. The sheriff says that he sold the residue of the articles in one lot, at the request of the judgment creditors, and other creditors who were present, and with the assent of both of the judgment debtors; and the plaintiff's witness swears that it was so sold in the expectation that it would bring a higher price—the property previously sold in small lots having been sacrificed. The intention of these witnesses to buy separate articles was wholly immaterial. It would not go to prove that the arrangement as to the mode of sale entered into by all the parties interested, who were present, was not in good faith, nor that the property would not bring more if sold in that manner than if sold in smaller lots.

The motion for a nonsuit was properly denied. This court, when the case was last before them, at the general term, decided that the questions, whether there was an intent to defraud creditors, whether the property was within view of those attending the sale, whether it was offered in such lots and parcels as were calculated to bring the highest price, and whether the plaintiff was in possession of the press at the time the suit was commenced, were, under the evidence, questions for the jury. The evidence upon the present trial is somewhat fuller than before, and removes all doubt, if any

had previously existed, of the propriety of submitting these questions to the jury. The last ground taken upon the motion for a nonsuit, that under these judgments the sheriff could only sell the individual interest of Reed, has been already passed upon.

The charge was in accordance with the decision of the court at general term, and was full and explicit. The four first requests were substantially charged. The instructions asked in the remaining two, the defendant was not entitled to.

There was no objection to the judge telling the jury that it was a question of great doubt, in his mind, whether the right of possession of the press was in Reed & Cunningham, under their lease, at the time of the levy—the lease to them not having been executed until after the levy and sale of the press under Ketchum's execution. An expression of opinion by the judge, founded upon the testimony, furnishes no ground for an exception. He submitted the question to the jury as a question of fact, and told them, that as they decided, they would find for the plaintiff or for the defendant. To this, also, an exception was taken. The judge certainly could not, upon the evidence before him, as matter of law, instruct the jury that they must find that Reed & Cunningham, and not the plaintiff, were in possession. The weight of the evidence was in fact the other way. Cunningham swears, that the press was not included in the property leased, nor in the schedule annexed to the lease. He says he had possession of the premises from December 7th, 1846, but no agreement from the plaintiff. That he had no arrangement with the plaintiff in January, 1847, the press having been sold on the 14th of that month, but that the arrangement was made with the plaintiff after the press was taken away. He says he had possession of the press and the use of it when it was taken by the sheriff; but this did not show that he or Cunningham & Reed were in possession by any agreement or understanding with the plaintiff for a definite time, which had not expired when the press was taken by the sheriff. The farthest

extent of it was, to show that he was in possession as the plaintiff's bailee; and if he was, the plaintiff, as the owner, and entitled to the possession, could maintain the action. The lease was dated before the press was taken, though not executed until eight months after the sale; and that being the fact, the judge very properly left it to the jury, telling them that they should find for the defendant if they thought the press was in the possession of Cunningham & Reed, under any definite hiring and for a term unexpired when the levy was made. This was all that the defendant could have asked. The application for a new trial should be dismissed.

INGRAHAM, FIRST J., concurred.

. WOODRUFF, J., dissenting.—I am not satisfied, that the case exhibited on the last trial is more favorable to the plaintiff than upon the former. But as my brethren concur, it is unnecessary for me to pursue the subject.

Order denying a new trial affirmed.